IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOHN DOHERTY,                    :

              Plaintiffs  :

    vs.                         :

STATE OF DELAWARE,               :  C.A. No. 04-370-SLR
DEPARTMENT OF CORRECTION,
NOREEN RENARD, JOSEPH            :
PAESANI, JAMES LUPINETTI,
MICHAEL TIGUE and ROBERT         :
I. GEORGE, JR.,
                                 :
              Defendants

        Deposition of JOHN DOHERTY taken pursuant to
notice at the Carvel State Building, 6th Floor Civil
Conference Room, 820 North French Street, Wilmington,
Delaware, beginning at 1:47 p.m., on Tuesday, June 21,
2005, before Allen S. Blank, Registered Merit Reporter
and Notary Public.

APPEARANCES:

    RICHARD R. WIER, JR., ESQUIRE
    RICHARD R. WIER, JR., P.A.
    1220 Market Street, Suite 600
    Wilmington, DE 19801

        For - Plaintiff

    MARC P. NIEDZIELSKI, ESQUIRE
    DEPUTY ATTORNEY GENERAL
    STATE OF DELAWARE
    DEPARTMENT OF JUSTICE
    820 North French Street, 6th Floor
    Wilmington, DE 19801

        For - Defendant
-----------------------------------------------------------

        WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, DE 19801
          (302) 655-0477

```
 1

 2                    JOHN DOHERTY,

 3         the deponent herein, having first been

 4          duly sworn on oath, was examined and

 5                  testified as follows:

 6                    EXAMINATION

 7  BY MR. NIEDZIELSKI:

 8      Q     Good afternoon, Mr. Doherty.

 9            Have you ever been deposed before?

10      A     Yes, I have.

11      Q     You understand the rules of deposition?

12      A     Yes.

13      Q     In other words, if for any reason you don't

14  understand a question I ask you, you should let me know

15  and I'll rephrase the question.

16      A     Certainly.

17      Q     Could you state your name for the record,

18  please?

19      A     My name is John Doherty, D-o-h-e-r-t-y.

20      Q     And what is your date of birth?

21      A     1/21/42.

22      Q     I'm going to hand you a document.  Have you

23  seen this document before?

24      A     Yes, I have.
```

1    Q    That's a notice of your deposition, is that

2  correct, sir?

3    A    That's correct.

4    Q    And you are the plaintiff in this lawsuit?

5    A    Yes, I am.

6    Q    Have you brought any documents with you that

7  would evidence your financial loss, if any, from the

8  demotion that's the subject matter of this lawsuit?

9         MR. WIER:  The only document, Marc, was --

10  and then we have this.

11         THE WITNESS:  Specifically, what I had

12  turned over to Mr. Wier sometime ago is the pay scale

13  from the Delaware State Personnel Office from fiscal

14  year 2003.  The effective date of the demotion was

15  2003.  Reflecting the salary grades and the variation

16  between a Grade 17 and a Grade 13 within the Civil

17  Service system or the merit system, however you want

18  the term it.

19         MR. NIEDZIELSKI:  Okay.

20         MR. WIER:  And we have those updated, Marc.

21         THE WITNESS:  There is an updated version

22  attached.

23  BY MR. NIEDZIELSKI:

24    Q    Are you continuing to be compensated at the

1  rate you were prior to your demotion?

2      A      That's correct.  That's correct.  I'm

3  continuing but I'm not being compensated at what would

4  have been the potential available salary within that

5  pay grade, Grade 17.

6      Q      But the salary that you were making as, what

7  was it, an operations manager?

8      A      I was the operations manager for the Bureau

9  of Community Corrections.  That's correct.

10     Q      And what was your pay grade?

11     A      17.

12     Q      And you were demoted to what?

13     A      Senior probation and parole officer, Grade

14  13.

15     Q      Okay.  But your actual salary remained as it

16  was when you were a Grade 17?

17     A      It was frozen at that time, yes.

18     Q      And did you continue to get the general

19  state increase if one was given?

20     A      That's correct.

21     Q      Are your retirement benefits going to be the

22  same?

23     A      No.

24     Q      How is that that they are going to be

1  different?

2     A     Well, they are going to be different because

3  of the potential move along the points at Grade 17 goes

4  by the high three years.  So obviously my high three

5  years now are not going to be what they could have been

6  had I remained in that position.

7     Q     And had you been promoted, it was within

8  that pay grade, you mean, moved along in that pay

9  grade?

10    A     That is not a promotion.  Moved along within

11  that pay grade, as has happened with me in the past.

12    Q     Once you got in the pay Grade 17, there is

13  no promise that you're going to move along that pay

14  grade, is there?

15    A     There is no promise but there is the

16  potential.

17    Q     Potential.  Okay.

18    A     As I said, that's happened before because of

19  the nature of the work I performed for the agency.

20    Q     As the operations manager.  And when was the

21  effective date of your demotion?

22    A     It was February -- the effective date was

23  sometime in February 2003.  I don't know if it was

24  effective on the 1st of February or the 12th or the

1  13th or something along that time.

2      Q      Okay.

3              MR. NIEDZIELSKI:  Would you mark this as an

4  exhibit?

5              (Doherty Deposition Exhibit No. 1 was marked

6  for identification.)

7  BY MR. NIEDZIELSKI:

8      Q      Would you look at the document that's been

9  marked as Doherty 1?  Could you identify that for us,

10 please?

11     A      I recognize this as an agreement that had

12 reached in what they call a predetermination hearing

13 before Richard Seifert, who was the deputy of the

14 Bureau of Prisons for the Department of Correction.

15 However, this is not the agreement that I signed off

16 on.

17     Q      I didn't ask you that.  I merely asked you

18 to identify it.

19             This is a letter addressed to you?

20     A      That is correct.

21     Q      And what's the date on the letter?

22     A      January 31st, 2003.

23     Q      And does it indicate in the content of the

24 letter that there was a verbal proposal as to an

1  agreement for disciplinary sanctions in the matter?

2      A    That's correct.

3      Q    All right.  That's all the questions I have

4  on that document.

5          (Doherty Deposition Exhibit No. 2 was marked

6  for identification.)

7  BY MR. NIEDZIELSKI:

8      Q    I'm placing another document in front of you

9  that has been marked as Doherty 2.  Do you recognize

10  that document?

11      A    Yes, I do.

12      Q    What is that document?

13      A    This is the finalized agreement that I

14  reached with Alan Machtinger, director of Human

15  Resources & Development for the Department of

16  Correction at that time.

17      Q    And what was the agreement?

18      A    The agreement is that I would get a written

19  reprimand.  I would receive no suspension, be demoted

20  from operations administrator pay Grade 17 to a senior

21  probation and parole officer, Grade 13, retaining my

22  current salary, be assigned to the Plummer House and

23  that the Department would provide me with a copy of the

24  Attorney General's opinion regarding the applicability

1   of the Police Officer's Bill of Rights when the

2   Department received it.  I wouldn't withdraw -- I

3   withdraw my current grievance and would not file

4   another grievance in this matter.

5            It also indicates, as a codicil, if you

6   will, to the agreement that I was not making any

7   waiver, expressed or implied, and also that I continue

8   to insist that this disciplinary action was unlawful,

9   meaning unlawful, pursuant to 11 Del Code 9200.

10       Q    But, in any event, did the Department of

11  Corrections perform the first five items?

12       A    Yes, they did.

13       Q    In accordance with the agreement?

14       A    Yes, they did.

15       Q    Were you represented by counsel when you

16  came to this agreement?

17       A    I was represented by counsel at that time,

18  yes.  However, in the hearing that preceded that

19  agreement, I was told I wouldn't need a lawyer by the

20  hearing officer.

21       Q    Who is the hearing officer?

22       A    Joseph Paesani, Deputy Chief of Community

23  Corrections.

24       Q    Did you have the right to an attorney?

1   A      I would have had the right to an attorney,

2  yes.

3   Q      You knew that, didn't you?

4   A      Yes, I did.

5   Q      Did you bring an attorney?

6   A      No, I didn't, because he told me I wouldn't

7  need an attorney at that hearing.

8   Q      Mr. Doherty, let's just start with the time

9  line here.

10   A      Okay.

11   Q      This matter involves a discipline against

12  you, is that correct?

13   A      That's correct.

14   Q      And is it correct that in around July, or

15  June, rather, of 2002, there was an investigation?

16   A      That is correct.

17   Q      An Internal Affairs investigation?

18   A      Yes.

19   Q      It involved you, correct?

20   A      Yes.

21          MR. WIER:  May I ask a question, please?

22          MR. NIEDZIELSKI:  Sure.

23          MR. WIER:  My understanding of the scope of

24  the discovery was that it is limited.

1          MR. NIEDZIELSKI:  Correct.

2          MR. WIER:  And so to the extent that these

3  questions relate to that --

4          MR. NIEDZIELSKI:  I'm not going to go into

5  any detail with them.  I just wanted to do a time line.

6  Just so we put this all in perspective.

7          MR. WIER:  All right.

8  BY MR. NIEDZIELSKI:

9      Q    There was an investigation.  And just for

10  purposes of the context here.  The subject of that

11  investigation was yourself, correct?

12     A    That's correct.

13     Q    Two other probation and parole officers that

14  you supervised?

15     A    That is correct.

16     Q    A gentleman by the name of Rowe?

17     A    Yes.

18     Q    Another gentleman whose name I can't

19  pronounce?

20     A    Kostelnik.

21     Q    Kostelnik?

22     A    Yes.

23     Q    And also involved a probationary?

24     A    Yes.

1    Q    With another name I can't pronounce?

2    A    Kokotaylo.

3    Q    And that's spelled K-o-k-o-t-a-y-l-o?

4    A    That sounds pretty close, yes.

5    Q    And the other gentleman's name was

6 K-o-s-t-e-l-n-i-k?

7    A    N-i-k, yes, sir.

8    MR. WIER:  Just for the record, I understand

9 you're doing a background.  But I'll just object at

10 this stage to any questions other than what loss of

11 pay, benefits, et cetera, as it relates to the

12 demotion.

13    MR. NIEDZIELSKI:  Okay.

14    MR. WIER:  And non monetary damages as well.

15 You can get into that.

16    MR. NIEDZIELSKI:  All right.

17 BY MR. NIEDZIELSKI:

18    Q    Did you, in any event, there was an

19 investigation in June of 2002, correct?

20    A    That's correct.

21    Q    And then there was a subsequent interview,

22 you were interviewed by IA at that time, is that

23 correct?

24    A    That's correct.

1      Q      You were subsequently interviewed by Bob

2    George?

3      A      That's correct.

4      Q      Who is the warden?

5      A      Yes.

6      Q      And he was assigned I guess as an

7    investigator, is that correct?

8      A      Well, I have to tell you, I was very

9    confused about that.  Internal Affairs conducted an

10   investigation.  I assume they reached a conclusion.  I

11   asked for, formally motioned for a copy of the Internal

12   Affairs investigative report, which was denied to me.

13   Robert George conducted an interview.  He claimed that

14   he was investigating the same matter.  And he

15   apparently reached certain conclusions, which ended up

16   with me being charged.

17     Q      Okay.  My point was that you had an

18   appointment to meet with Mr. George, correct?

19     A      That's correct.

20     Q      And prior to meeting with Mr. George, you

21   were explained or he sent you a letter explaining to

22   you the subject matter of the interview?

23     A      That's correct.

24     Q      And it was about these matters that at some

1  point became your discipline, correct?

2      A     Yes.

3      Q     And at your interview itself on August 7,

4  2002, you had the right to appear with counsel, did you

5  not?

6      A     Yes, I did.

7      Q     And you chose not to?

8      A     I had not consulted counsel at this point.

9  I had no reason to.  I thought that everything was

10  aboveboard and that it was going to be an honest

11  investigation.

12      Q     My question was, you knew that you could

13  have brought an attorney?

14      A     I knew that I could have brought an

15  attorney.

16      Q     You chose not to?

17      A     That's correct.

18      Q     All right.  Now, then Mr. George completed

19  his investigation.  Did you get a copy of that report?

20      A     Yes, I did.

21      Q     And as a result of that report, did you

22  retain counsel?

23      A     Yes, I did.

24      Q     You retained an attorney by the name of

1  David Anderson?

2      A     That's correct.

3      Q     And he filed a motion on your behalf, is

4  that correct?

5      A     He filed a motion to suppress evidence, yes.

6      Q     Subsequently, you had a hearing, a fact-

7  finding hearing, is that correct?

8      A     That's correct.

9      Q     Do you remember when the fact-finding

10 hearing was?

11     A     I couldn't remember.

12     Q     At that fact-finding hearing, who presided

13 at that fact-finding hearing?

14     A     Joseph Paesani.

15     Q     And do you know Mr. Paesani?

16     A     Yes, I do.

17     Q     Were you allowed to bring evidence at this

18 point?

19     A     Actually, the evidence that I requested be

20 produced to me to prepare for that hearing was denied.

21 I had formally protested the hearing.  I had indicated

22 to him -- well, to him primarily that the hearing was

23 illegal.  And I continued to request documents in the

24 Department's possession that I believed would help me

1  establish my innocence of the accusations made by

2  Robert George.

3      Q      Perhaps my question wasn't very well casted.

4  Perhaps I should try again.

5      A      Okay.

6      Q      You were not prevented from bringing any

7  evidence that you wanted to bring with you, were you?

8      A      Well, of course, I was.

9      Q      You were?

10     A      Yes.  Because the evidence was in the

11  Department's possession and they refused to surrender

12  it.

13     Q      I mean you could have brought your own

14  witnesses, correct?

15     A      I wasn't given an opportunity to present

16  witnesses.

17     Q      Well, at the point that you met with Mr.

18  Paesani --

19     A      I was given no formal notice of this

20  hearing.  You will find no formal notice of this

21  hearing anywhere telling me that I had a right to do

22  anything.

23     Q      Okay.

24     A      Because it doesn't exist.

1    Q    Was it scheduled?  Were you notified

2  sometime prior to --

3    A    I was notified by a secretary.

4    Q    When?

5    A    I have no idea.

6    Q    Was it prior to the hearing?

7    A    I got a phone call.  Prior to the hearing.

8    Q    How many days?

9    A    Well, the hearing was scheduled.  I

10  originally got a phone call from a secretary.  There

11  was a hearing scheduled.  I filed several motions,

12  including the motion to suppress evidence.

13    Q    Prior to the hearing?

14    A    Yes.  And then I was told that that hearing

15  was cancelled.  I said, what do you mean cancelled?  He

16  said, just cancelled.  I said, does that mean

17  postponed?  He says, no, just cancelled.

18          Then some weeks, perhaps a month later, I

19  was again contacted by the same secretary saying that

20  there would be a hearing.  Special date.  I went and

21  spoke to Mr. Paesani.  I asked Mr. Paesani if the

22  Department was going to produce the documents that I

23  had requested.  He said, I'm still waiting to hear from

24  the lawyers.  I said, well, you know, my lawyer would

1  like to have these documents, I'd like to have an

2  opportunity to prepare for this.  He says, you don't

3  need a lawyer for this.  At that time, I was aware of a

4  section in 9200 that said if there is going to be

5  anything more than a reprimand, then these are the

6  rules, the hearing rules, that must be followed.

7          So when Mr. Paesani tells me there is going

8  to be a hearing other than a 9200 hearing and he tells

9  me I don't need a lawyer, my natural assumption was

10  that I was going to get an official reprimand, not a

11  recommendation to be terminated.

12    Q    Prior to the hearing that you had with Mr.

13  Paesani, were you aware of the report by Warden George?

14    A    Yes, I was.

15    Q    How long prior to that hearing?

16    A    Oh, quite a long time.  A number --

17    Q    A month?

18    A    I would say probably a month and a half.

19    Q    Did you have an opportunity during that

20  period of time to look at the report?

21    A    Yes, I did.

22    Q    And to point out to anyone or get evidence

23  of what you thought was incorrect in the report?

24    A    I attempted to get evidence about incorrect

1  statements or incorrect allegations in the report.

2  First of all, there are no -- essentially no

3  specifications in the report.  Just charges.

4      Q    Well, one of the allegations was that you

5  paid the probationer, whose name we can't pronounce, to

6  paint your house?

7      A    That's correct.

8      Q    That was true, wasn't it?

9      A    Yes, it was.

10     Q    And on more than one occasion?

11         MR. WIER:  Marc, can I ask a question?

12         MR. NIEDZIELSKI:  Sure.

13         MR. WIER:  It seems to me it was somewhat

14  afield because we weren't I guess intending to go into

15  the substance of his due process claim.

16         MR. NIEDZIELSKI:  Let me just drop back.

17  And if your client would just answer my questions, we

18  don't have to go back there.  Okay?

19         MR. WIER:  Well, he can answer.  I will have

20  him answer any question that you ask.  All I'm saying

21  is I will reserve the right to recall him and ask

22  questions about the substance of the claim.

23         MR. NIEDZIELSKI:  Okay.

24  BY MR. NIEDZIELSKI:

1     Q    Mr. Doherty, you have explained that the

2  document you brought with you is from the Delaware

3  State Personnel Office, the pay scales, correct, based

4  on the 40 hours per workweek?

5     A    Yes.

6     Q    And you said there was a difference between

7  pay Grade 13 and pay Grade 17, correct?

8     A    Yes.

9     Q    And that within those pay grades, there are

10  differences, different percentages of mid point,

11  correct?

12     A    That's correct.

13     Q    Now, other than that, what do you believe

14  evidences damages, financial damages, you have suffered

15  as a result of this demotion?

16     A    Well, the first damage that I suffered was

17  that pay Grade 17, of course, is a senior management

18  position, non-union senior management position.  Grade

19  13 is, however, in the bargaining unit and you must

20  either join the bargaining unit or pay a service fee,

21  which initially was $20.00 a month and is now $30.00 a

22  month.  And it's a closed shop.  So you must pay that

23  service fee.

24     Q    Okay.  So you have to pay $30.00 a month

1  now?

2      A     That's correct.

3      Q     Now, when you were the manager at pay Grade

4  17 --

5            MR. WIER:  I'm sorry.  Have you finished

6  your answer?

7            THE WITNESS:  I think so.  With regard to

8  the union dues.

9  BY MR. NIEDZIELSKI:

10     Q     Is there anything else?

11           MR. WIER:  The question was what is your

12  financial loss.

13           THE WITNESS:  Oh, what other financial loss?

14           MR. NIEDZIELSKI:  Um-hmm.

15           THE WITNESS:  Other financial loss didn't

16  emerge until the transfer progressed.  That's turned

17  out to be a significant loss.  Because when I was being

18  transferred from a management position where I didn't

19  have to carry a firearm to a front line position in a

20  very active line unit, I put in a request to the

21  director of probation and parole first in writing that

22  I could be -- since I had not carried a weapon in a

23  year, that I could be admitted to a training class so

24  that I could be recertified.

1          I got no response to that written

2 communication, which I have a receipted copy of.

3          Then the next that issue came up is when I

4 met with the director to turn in my badge and equipment

5 because I was -- had been working for him for several

6 weeks.  And I again went over the situation.  I said,

7 you know, I'm being transferred to ICSP.  That is a

8 very active street unit.  I couldn't even carry a gun.

9 And he said he would see what he could do.  But

10 essentially that request was ignored.

11          Now, once I get to the unit, I'm the only

12 one there that doesn't carry a firearm.  So the boss

13 there says to me, well, you know, you're going to be

14 kind of restricted because I can't have you out doing

15 this job without a firearm.

16          The other issue, of course, is that there is

17 a substantial amount of overtime available within that

18 unit.  They are responsible for escape recoveries.  The

19 other overtime that's available to a Grade 13 is there

20 is an overtime list that you can sign up for where

21 you're actually on call or can be called in overtime

22 situations that arise in probation and parole in New

23 Castle County.  It is contractual, I believe a

24 contractual agreement.  But you must carry a firearm.

```
 1              So if the Department's unresponsive in

 2    getting you recertified, you can't carry a firearm.

 3    Obviously I'm the only one in the unit that doesn't

 4    carry a firearm.  I'm the only one in the unit that

 5    can't work overtime.

 6    BY MR. NIEDZIELSKI:

 7         Q     Are you licensed to carry a firearm?

 8         A     I don't need a license to carry a firearm

 9    unless I'm off duty, unless it's off duty.  I mean on

10    duty.  I can carry a firearm at any time when I am not

11    working for probation and parole.  I'm a retired police

12    officer.  I'm qualified.  I'm entitled by the state and

13    federal law to carry a firearm except when I'm working

14    for probation and parole.

15         Q     You're licensed to carry a firearm?

16         A     No.

17         Q     You don't have a license to carry a firearm?

18         A     No.

19         Q     You don't have a license to carry a

20    concealed deadly weapon?

21         A     No.  I'm a retired police officer.  I'm

22    entitled by state and federal law to carry, as long as

23    I'm qualified, to carry a firearm without a license.

24         Q     And what do you have to do to qualify?
```

1    A      You have to qualify according to the

2    qualifications standards of the parent agency,

3    whichever agency you're retired from, which is the

4    Wilmington City Police Department.

5    Q      And do you do that?

6    A      No.

7    Q      Did you say that you are licensed or you --

8    A      I'm not licensed.  I do not have a license

9    from the Superior Court to carry a concealed weapon.  I

10   said I'm entitled by law to carry a concealed weapon

11   without a license.

12   Q      But then you said only if you qualify on an

13   annual basis or whatever it is?

14   A      That is correct.

15   Q      Have you done that?

16   A      No, I haven't.

17   Q      Well, then you're not licensed to carry a

18   firearm.  Is that what you're saying?

19   A      Yes.  No, I can't carry a firearm now, no.

20   Q      Okay.

21   A      But I could.  All I'd have to do is go and

22   shoot at the Wilmington Police range.

23   Q      And what do you have to do to be recertified

24   to carry a firearm for the state?

1      A      For probation and parole?

2      Q      Yes.

3      A      I would have to go through a training

4  program, probably the 40 hour basic firearms program.

5      Q      Did you go through that once, that program?

6      A      Actually, not only did I go through it but I

7  also trained and certified just about every probation

8  officer in the state at that time.

9      Q      And so for a year, you didn't carry a

10  firearm?

11      A      This is because of probation and parole

12  regulations.  The regulations on carrying a firearm.

13  That's why I can't carry a firearm.

14      Q      Because you haven't been recertified?

15      A      Because I haven't been recertified.

16      Q      Can't you just go down to the corrections

17  range and recertify?

18      A      No, sir, I can not.

19      Q      Why is that?

20      A      Because probation and parole, that's the

21  Department of Correction, Bureau of Prison Standards.

22  Probation and parole has a much higher standard to

23  carry a firearm.  You've got to go back through certain

24  parts of the certification course.  I would suspect

```
1   through most of the firearms, the 40 hour firearms

2   training program.

3        Q    Have you taken any efforts to do that?

4             MR. WIER:  Asked and answered.

5   BY MR. NIEDZIELSKI:

6        Q    You indicated that you wrote to someone?

7        A    The director of probation and parole.  The

8   boss.

9        Q    And what was the response?

10       A    There was no response.

11       Q    And so what did you do about that?

12       A    What could I do about it?

13       Q    Well, I'm saying, did you follow up?

14       A    I did nothing.

15            MR. WIER:  Asked and answered.  I thought

16  you said he asked twice.

17            THE WITNESS:  I did nothing else.

18  BY MR. NIEDZIELSKI:

19       Q    So you asked once.  By e-mail or something?

20       A    I asked twice.  Once by e-mail and once in

21  person.

22       Q    All right.  Now, at the time you were the

23  pay Grade 17 operations manager, what was your work

24  location?
```

1    A    Headquarters in Dover.

2    Q    How did you get there every day?

3    A    I drove my personal car.

4    Q    And did you go down Route 1?

5    A    Yes.

6    Q    And was there an expense with that?

7    A    The tolls.

8    Q    How much are they?

9    A    I have no idea what they are right now.

10   There is a discounted, an Easy Pass that are

11   discounted.

12   Q    Do you have an Easy Pass?

13   A    Yes, I do.

14   Q    Would it be at least two dollars a day?

15   A    Probably, yes.

16   Q    In addition to that, there was mileage on

17   your vehicle?

18   A    Yes.

19   Q    How many miles would you put on your vehicle

20   one way?

21   A    I have no -- what's the distance from here

22   to headquarters, from Wilmington to headquarters?

23   Fifty-seven miles, 54 miles.  I don't know.

24   Q    And would that be twice a day?

1    A    Twice a day.  Down and back, yes.

2    Q    So it would be fair to say that when you

3  worked in Dover as a pay Grade 17, in addition to

4  paying two dollars in tolls a day, you also had to

5  drive a hundred miles a day?

6    A    That is correct.

7    Q    And that was wear and tear on your private

8  vehicle?

9    A    Yes.

10    Q    You no longer have to put a hundred miles a

11  day on your vehicle, do you?

12    A    No.

13    Q    Is the wear and tear on your vehicle much

14  less today than it was when you were a pay Grade 17?

15    A    Yes.  My expenses are more.

16    Q    Why is that?

17    A    Well, I am assigned as court liaison

18  officer.  I have to go to Superior Court or one of the

19  county courts just about every day.  Perhaps three

20  times, two to three times a day, depending on where

21  hearings are.  And the cost is somewhere -- anywhere

22  from 10 to 15 dollars a day.

23    Q    In what?

24    A    The parking costs.

```
 1     Q      Aren't they reimbursed?

 2     A      No, they are not.

 3     Q      Why not?

 4     A      I have no idea.

 5     Q      Have you asked for reimbursement?

 6     A      Yes.

 7     Q      You're saying as part of your job, you're

 8  required to go to court and pay parking and you're not

 9  reimbursed for that?

10     A      That's correct.

11     Q      And you have put in for parking?

12     A      Well, we have asked for a parking pass, you

13  know, so that we could use the pass.  For some reason,

14  Plummer Center just doesn't have it.

15     Q      Who is your supervisor?

16     A      Michael Cocuzza.  He is a probation and

17  parole supervisor.  Grade 15.

18     Q      And he works at the Plummer Center?

19     A      Yes, he does.  So I keep my receipts and I

20  report it to the IRS and try to get some of it back.

21     Q      Okay.  Any other expenses that we haven't

22  discussed that you have now or financial expenses you

23  now have that you didn't have before?

24     A      Not that I'm aware of.
```

1          MR. NIEDZIELSKI:  That's all the questions I

2  have.

3          MR. WIER:  No redirect.  We have referenced

4  this document.  So I'd like to at least mark it.

5          MR. NIEDZIELSKI:  Okay.  We'll mark this as

6  3.

7          (Doherty Deposition Exhibit No. 3 was marked

8  for identification.)

9          MR. WIER:  Doherty 3.

10         MR. NIEDZIELSKI:  And I would like to mark a

11 document.  We don't have to discuss it because you

12 don't want to talk about it.

13         MR. WIER:  It is not that I don't want to

14 talk about it.  It is just that my understanding --

15         MR. NIEDZIELSKI:  Just get your client to

16 agree that he did file that letter and see if we can

17 just attach that.  It is his letter and his petition.

18         MR. WIER:  What is it you're asking?

19 BY MR. NIEDZIELSKI:

20    Q    Have you seen this document before, Mr.

21 Doherty?

22    A    That is correct.

23    Q    This is the document you filed, I believe,

24 in support of your contentions?

1      A      No, what you have handed me is --

2      Q      I'm sorry.  I may have handed you the wrong

3  thing.

4      A      You handed me the chief's correspondence.

5      Q      Okay.  I did hand you the wrong thing.  I'm

6  sorry.

7             Here.  Is that it?  It should be stamped

8  January 28th at the top.

9      A      No, this one is stamped January 17.

10     Q      Is that Machtinger?

11            MR. WIER:  Is this the one?

12            MR. NIEDZIELSKI:  That's it.  Got it.

13            THE WITNESS:  I recognize this as a step one

14  grievance, yes, and also a petition to vacate an order

15  of disciplinary action.

16            MR. NIEDZIELSKI:  Can you mark that as 4,

17  please?

18            (Doherty Deposition Exhibit No. 4 was marked

19  for identification.)

20            MR. NIEDZIELSKI:  Thank you.  That's all the

21  questions I have.

22            Do you want to read or waive the reading?

23            MR. WIER:  I'm sorry.  I apologize.  Let me

24  just go on the record and ask him one question just to

1   wrap it up.

2          It's your position that the case law

3   supports the proposition that non monetary losses are

4   also losses within the property right issue?

5          MR. NIEDZIELSKI:  Um-hmm.

6          MR. WIER:  But the Court has directed us to

7   initiate discovery in terms of loss of pay and

8   benefits?

9          MR. NIEDZIELSKI:  Correct.

10         MR. WIER:  So I want to ask just one general

11  question.

12                    EXAMINATION

13  BY MR. WIER:

14     Q     Mr. Doherty, did you also lose non economic

15  or suffer non economic losses as a result of the

16  demotion?

17     A     Oh, yes, I have.  Absolutely.

18     Q     Do you generally want to just categorize

19  what they are?

20         MR. NIEDZIELSKI:  I'm going to object, of

21  course, because it's beyond the scope.  But go ahead.

22         THE WITNESS:  All right.  I have been a law

23  enforcement officer in Delaware for 38 years.  Retired

24  from the Wilmington City Police Department as an

1    inspector, second in command.  Wilmington City Police

2    Department.  I held positions of trust in the police

3    department in the criminal investigation division for

4    14 years.  I at one time was the commanding officer of

5    the Attorney General's special investigation unit.  I

6    commanded the patrol division.  I was responsible as

7    chief of staff inspections for all internal

8    investigations and internal discipline within the

9    police department.  I come to probation and parole.

10    And immediately when I arrived at probation and

11    parole --

12    BY MR. NIEDZIELSKI:

13       Q    Prior to that, where else did you work?

14       A    I was also an instructor since 1972 at the

15    University of Delaware.  I taught police science,

16    homicide investigation.  A number of separate classes,

17    including education and training in law enforcement.  I

18    was there until 1996.

19            I have also lectured at police academies and

20    universities essentially throughout the country,

21    University of South Carolina, John Jay School of

22    Criminal Justice.  I have a very significant

23    representation in the criminal justice community.

24       Q    Did you also work in federal law

1  enforcement?

2      A    After I retired from police -- I had to

3  retire on a disability pension.  I was injured.  You

4  can't carry a disability, line of duty disability

5  beyond your 20th anniversary.  So I had to retire at 19

6  years and six months.  I went to work for the U.S.

7  Marshall's Service in Federal Court security.  While I

8  was going to graduate school at the same time.  And

9  then I took the job in probation and parole, not

10  necessarily to be a probation and parole officer, even

11  though that was -- that had to be done.  But to help

12  probation and parole establish policies, procedures,

13  training programs.

14          There was a dramatic shift occurring at that

15  time.  Probation and parole officers were empowered to

16  make arrests.  They were untrained.  They were

17  unequipped.  Initially, I was sent out to Harrisburg,

18  Pennsylvania, where I attended and graduated from the

19  Pennsylvania Probation & Parole Academy.  And then I

20  immediately started developing a training program,

21  first in arrest procedures, followed immediately

22  thereafter by development and design of the basic

23  officer's training program for probation and parole

24  officers, which is still being used today.  Eventually

1  the firearms training program was married to that.  I

2  participated in training officers in those areas for I

3  would imagine in the neighborhood of eight years.

4          So this incident has resulted in the

5  destruction of a reputation 38 years in the making.

6  People back away from you.  I essentially have no

7  friends in Delaware Probation & Parole because I'm kind

8  of isolated from them.  I think I'm the only probation

9  and parole officer in the state that works in a

10  maintenance garage.  In between going to court.  And

11  it's a devastating effect.  And I feel it's a

12  devastating effect that took place because I was not

13  allowed to defend myself at the kind of hearing that 11

14  Del Code 9200 requires where I could have questioned

15  people who made fraudulent statements within those

16  reports that you have.  And I could have seen

17  supervision records generated by Officer Kostelnik that

18  I know were fraudulent, that I know were doctored since

19  I had seen them between the time I saw them and the

20  time of the investigation had initiated.

21          I could have established that my immediate

22  superior at the time that I was a Grade 15 at New

23  Castle just absolutely flagrantly lied to Internal

24  Affairs.

1          MR. NIEDZIELSKI:  Just hold on.

2          MR. WIER:  Those are my questions.

3          MR. NIEDZIELSKI:  Okay.  You just opened the

4  door.

5  BY MR. WIER:

6     Q     The non economic loss is what I was talking

7  about.  As part of your job as a pay Grade 17, what

8  were your duties and to whom did you report?

9     A     I reported directly to Chief Renard, the

10  chief of the Bureau of Community Corrections.  Other

11  duties consisted of internal investigations, developing

12  policy and procedure at the bureau level.  I continued

13  to serve at that time as the coordinator of

14  communications, radio communications for the entire

15  department.

16    Q     Where was your office located?

17    A     My office was at headquarters about 20 steps

18  from the Commissioner's door.

19    Q     When you were demoted, did the benefits of

20  that position change adversely?

21    A     Well, the first thing that happened was --

22  first of all, I got the notice in the mail as opposed

23  to from people that I saw and worked with every day.

24  Notice came in the mail.  And I was instructed to, you

1  know, basically get out of Dodge.  Transferred over to

2  probation, Dover District of Probation & Parole in

3  Dover.  Answering to the director of Probation &

4  Parole, who works in New Castle.

5          During that period, I had a chance to

6  prepare some documents.  The petition to vacate the

7  decision.  I generated initially a grievance on the

8  thing, which I realized would be unproductive

9  immediately.  There was no sense in even doing that if

10 they weren't going to recognize my basic rights under

11 the Constitution and under the laws of the state.

12     Q     Are you referring to LEBOR?

13     A     Sure.  Delaware code.  There didn't seem to

14 be any sense in going forward with any procedure

15 involving the same people that had made the decisions

16 to deny me my rights in the first place.  So I,

17 frankly, I stopped all of that and here I am.

18     Q     Did the Attorney General's Office at some

19 point, prior to this lawsuit, I think you testified

20 that you were denied rights under the Law Enforcement

21 Officer's Bill of Rights?

22     A     I was denied rights under the Law

23 Enforcement Officer's Bill of Rights at the hearing

24 itself, at which point I would have been able to

1  establish that the regional manager was untruthful in

2  his statements to Internal Affairs.

3      Q      The Department said you were not covered by

4  the Law Enforcement Officer's Bill of Rights?

5      A      The Department never responded formally to

6  anything.  They never responded to any of my requests

7  for the production of evidence, they never responded to

8  my requests to interview, reinterview the regional

9  manager after I provided additional information to

10  Robert George.  He told me that he would conduct

11  additional interviews.  He did not.  The question file

12  on the offender, which was very significant.  Because

13  within my recollection, there is a memorandum of

14  reference in that file explaining exactly when and

15  where I notified the regional manager of our attempts,

16  our extraordinary attempts to try to keep this one boot

17  camper from going back to prison.  We just tried it

18  once.  And it just didn't work.

19      Q      Did there subsequently come a time when you

20  were provided with an Attorney General's opinion as set

21  forth in Doherty No. 3?

22      A      Yes, there was.

23      Q      And what did that opinion conclude?

24      A      The opinion concludes that I was entitled to

1  all of the rights outlined in 9200, including the

2  hearing.  And including access to the exclusionary rule

3  within 9200 that would have prevented any unlawfully

4  obtained evidence from being admitted at the Trial

5  Board.

6              MR. NIEDZIELSKI:  Are you done?

7              MR. WIER:  That's all I have.

8                          EXAMINATION

9  BY MR. NIEDZIELSKI:

10       Q     The evidence that you're talking about is a

11  financial document that you brought with you to the IA?

12       A     That is correct.

13       Q     You brought them with you?

14       A     Yes, I did.  To show them to the internal

15  investigator.

16       Q     Okay.  All of your present arguments, your

17  contentions, are contained in your grievance, your

18  petition, are they not?

19       A     They are.

20       Q     You work 40 hours a week?  Do you work 40

21  hours a week?

22       A     Now?

23       Q     Yes.

24       A     Usually quite a bit, somewhat more than 40

1  hours a week.

2      Q      Do you put in for overtime?

3      A      No.

4      Q      Did you work more than 40 hours a week when

5  you were in Dover?

6      A      Yes.  Frequently.

7      Q      Did you get overtime then?

8      A      No.

9      Q      And you're saying that because you don't

10  carry a gun, you can't get overtime?

11      A      That's correct.  I can't.  I have no access

12  to carry a gun.  That has not always been true.  There

13  have been times during extreme manpower constraints

14  where I have had to go out and help in hunting down

15  escapees.  There have been times when I have been the

16  only one, including the offender, that didn't have a

17  weapon at a scene, at a scene of like a search and

18  arrest or whatever.  And there were times when I have

19  had to arrest people without a weapon or any other

20  means of defense.

21      Q      So you don't feel you need a weapon?

22      A      Of course I need a weapon to do this job.

23              MR. NIEDZIELSKI:  Would you mark this as the

24  next document, please?

1                  (Doherty Deposition Exhibit No. 5 was marked

2   for identification.)

3   BY MR. NIEDZIELSKI:

4        Q     Have you ever seen this document before, Mr.

5   Doherty?

6        A     Yes, I have.

7        Q     What is it?

8        A     It's an e-mail I sent to the chief.

9        Q     And you're talking about Noreen Renard?

10       A     That's correct.

11       Q     Was it truthful what you wrote there?

12       A     Yep.

13             MR. NIEDZIELSKI:  That's all the questions

14   that we have.

15             Will you waive reading?

16             MR. WIER:  No, we won't waive reading.

17   We'll read and sign.

18             MR. NIEDZIELSKI:  Okay.  Thank you.

19             (Deposition concluded at 2:28 p.m.)

20

21

22

23

24

1

2                          I N D E X

3

4   DEPONENT:  JOHN DOHERTY                          PAGE

5      Examination by Mr. Niedzielski               2

6      Examination by Mr. Weir                      31

7      Examination by Mr. Niedzielski               38

8

9

10                        E X H I B I T S

11              DOHERTY DEPOSITION

12   NUMBER              DESCRIPTION              MARKED

13    1        Letter dated January 31, 2003, to      6
              John Doherty from Richard Seifert
14
      2        Letter dated February 13, 2003,        7
15             to John Doherty from Alan Machtinger

16    3        Delaware State Personnel Office       29
              Pay Grade Table
17
      4        Letter dated January 27, 2003, to     30
18             Chief Noreen Renard from John Doherty,
              with attachments
19
      5        E-mail to Noreen Renard from John     39
20             Doherty dated Wednesday, December
              31
21

22

23

24

1
2
3
4
5
6
7                    DEPOSITION CERTIFICATE
8
9                    SIGNATURE NOT WAIVED
10
11
12                   REPLACE THIS PAGE WITH
13
14              THE ERRATA SHEET AFTER IT HAS
15
16          BEEN COMPLETED AND SIGNED BY THE DEPONENT
17
18
19
20

21
22
23
24

1  State of Delaware          :

2  County of New Castle       :

3

4                  CERTIFICATE OF REPORTER

5          I, Allen S. Blank, Registered Merit
   Reporter, do hereby certify that there came before me
6  on the 21st day of June, 2005, the deponent herein,
   JOHN DOHERTY, who was duly sworn by me and thereafter
7  examined by counsel for the respective parties; that
   the questions asked of said deponent and the answers
8  given were taken down by me in Stenotype notes and
   thereafter transcribed by use of computer-aided
9  transcription and computer printer under my direction.

10         I further certify that the foregoing is a
   true and correct transcript of the testimony given at
11 said examination of said witness.

12         I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
13 interested in the event of this suit.

14

15

16     _____

                  Allen S. Blank, RMR
17
               Certification No. 103-RPR
18
               (Expires January 31, 2008)
19

20

21

22 DATED:  June 23, 2005

23

24