

John Doherty
511 Milton Drive
Wilmington, DE 19802

January 27, 2003

Chief Noreen Renard
Bureau of Community Corrections
245 McKee Road
Dover, DE 19904

RE: Disciplinary Action
     Step 1 Grievance

Dear Chief Renard,

As you may be aware, I have requested a Pre-Decision Meeting concerning the Disciplinary Action that you imposed in my case on January 15, 2003. However, the reply that I received from the Director of Human Resources and Development was vague and ambiguous. I shall still pursue my request for that meeting.

It does appear necessary that I preserve my rights under the Grievance Procedure by initiating a Step 1 Grievance at this time in order to comply with the time limitations. Therefore, please review this grievance and schedule a hearing in compliance with Section 20.6 of the Merit Rules.

I respectfully request that your order of disciplinary action be set aside and that I be restored to full duty for the following reasons:

The principle reason for that request is that I am not guilty of any and all of the charges submitted by the Fact Finding Officer. In addition, the disciplinary action should be set aside because:

1. Just cause does not support the penalty.
2. The administrative Investigation and the Fact Finding Process upon which the disciplinary action relies were incomplete, flawed and biases.
3. The procedures followed in the investigative and Fact Finding Process were unlawful.

Annexed to and incorporated within this grievance is the attached Petition to vacate your order of disciplinary action. That annex sets out the details of the above claims.

Sincerely,

John Doherty
John Doherty

DEPOSITION EXHIBIT #4

IN THE MATTER OF:

Department of Correction
State of Delaware
*Plaintiff*

v.

John G. Doherty, Jr.
*Respondent*

IN RE: Disciplinary Action Proceedings

### Petition to Vacate Order of Disciplinary Action

COMES NOW John G. Doherty, Jr., Respondent who respectfully petitions that the proposed ORDER of Disciplinary Action imposed by Chief Noreen Renard, Chief of the Bureau of Community Corrections, Delaware Department of Correction be vacated and set aside for the following reasons:

I.   Just Cause does not support the proposed penalty.
II.  The administrative investigation and Fact Finding Process upon which the disciplinary penalty relies were incomplete, flawed and biased.
III. The procedures followed in the investigative and Fact Finding process were unlawful.

### I. Just Cause does not support the disciplinary action because I am not guilty of the offences charged by the Fact Finding Officer. There is no credible evidence to support the Fact Finding Officer's conclusions.

The Fact Finding Officer concluded that the Respondent conspired with two subordinate officers to conceal a conflict of interest between a Probation/Parole Officer and an offender in his charge.

In reaching that conclusion, the Fact Finding Officer relies solely upon the uncontested and self-serving statements of the subordinate officer who actually and admittedly committed the acts that underlay this disciplinary proceeding.

At the time that the subordinate officer made the statements that implicate the Respondent, he knew that he was in immediate peril of dismissal from employment. That person has been clearly established to have made previous false statements, engaged in deceptive acts and filed false official reports in this same case. He is clearly not entitled to the benefit of any credibility as a witness.

1

Against the testimony of that proven prevaricator, the Fact Finding Officer below weighed the testimony of the only other witness with direct personal knowledge of the events which testimony supports the Respondent's testimony that no such conspiracy ever took place and the testimony of the Respondent who is a 36 year veteran of public service in Delaware who has a widely recognized record of truthful and faithful service which includes 15 years of service in the Department of Correction. The Respondent's service in the Department is well marked with recognition for outstanding service balanced against only one disciplinary infraction, which is outdated, as well as a hard earned reputation for truth and veracity that has been established in the courts of this State throughout a 36-year period. The Fact Finding Officer weighted his decision in favor of the proven prevaricator!

Essentially, the Fact Finding Officer lays out a case of conspiracy between the Respondent and two subordinate officers. However, there is no evidence present in the record, shallow as it is, that indicates that Respondent entered into any agreement or, "SCHEME," with those two officers or with anyone else to engage in any conduct which was contrary to the rules and procedures of the Department of Correction. On the contrary, the only competent evidence reveals nothing but a Probation/Parole Supervisor trying to ensure that effective supervision was taking place and attempting to engage in a plan of rehabilitation for the offender in question. All of the Respondent's actions were consistent with the agency's published mission statement.

The Fact Finding Officer submits that Respondent Failed to act to remove a conflict of interest in case supervision after a subordinate officer declared that conflict of interest. The facts are, as Respondent and the only reliable witness to the actual events have consistently related them, that the officer in question never reported such a conflict of interest. His stated intent was to set up a supervision plan that would avoid even the appearance of a conflict of interest.

Furthermore, that subordinate never reported any pre-existing relationship with the offender as mentioned by the Administrative Investigator and the Fact Finding Officer. The concept of a, "pre-existing relationship," was never introduced into this matter in any way until after the subordinate in question fell under investigation. Prior to that it was never mentioned to the Respondent or to anyone of whom the Respondent is aware. Excepting for the testimony of a proven liar, there is no evidence in this record to the contrary.

The Fact Finding Officer has assigned entirely too great a weight and value to the uncontested testimony of one person who obviously had the greater chance of gain by being deceptive and untruthful and the greater chance of loss by being truthful.

2

The Fact Finding Officer has determined that the Respondent attempted to conceal and camouflage certain facts in this case. In order to try to conceal anything a person would have tried to keep it secret. That is far from the truth. Since Respondent's initial interview with Internal Affairs officers on June 10, 2002 through the intensive interrogation conducted by the Administrative Investigator on August 7, 2002 and in the Fact Finding Meeting on October 1, 2002, Respondent has steadfastly maintained that he briefed his immediate superior, the Regional Manager initially regarding one of Respondent's subordinate officers having requested permission to extend a special rehabilitative effort with a young offender on his caseload, intermittingly with regard to the progress of those efforts and eventually when the case was divided between the officer in question and his immediate superior officer for the purpose of avoiding even the appearance of a conflict of interest. On each occasion of those briefings, the Regional Manager indicated agreement with the proposed course of action and approved the continuance of the effort. There was no effort on the part of the Respondent to camouflage anything. There is no credible evidence in the record to the contrary.

According to the material that was turned over to the Respondent pursuant to departmental regulation prior to the Fact Finding Meeting, the Regional Manager in question has only been interviewed one time by the Internal Affairs investigators. He was asked if Respondent ever obtained his permission for the questioned supervision plan. He replied in the negative and went on to say that he never even knew the name of the particular offender or of the fact that he was being supervised in the district before the initial investigation was initiated. On August 7, 2002, Respondent advised the administrative investigator that the Regional Manager's statement could be proven to be inaccurate. Respondent explained that the Regional Manager had once personally interviewed the offender in question as a perspective guest speaker at a college course that the manager was teaching. There were a number of avenues of investigation available to the administrative investigator to establish the truth of this issue. He chose to pursue none of those avenues. Perhaps as little as a simple re-interview of the Regional Manager in light of the new information that Respondent provided might have jogged the witness' memory. In that case the camouflage and conspiracy theory would have been exposed as unfounded. There was no search for the truth that might have revealed exculpatory evidence. Someone had developed the theory that there was a conspiracy and so all investigative efforts were directed at uncovering every shred of circumstantial evidence to support the conspiracy theory. The possibility of uncovering exculpatory evidence was and had to be avoided at all costs in order to prove the circumstantial conspiracy theory that had already been formulated.

Since the briefings of the Regional Manager took place behind closed doors between just two people, it is impossible to establish the total accuracy of either statement beyond any doubt. However, Respondent has on two occasions offered to submit to a polygraph examination to support his version of the events. The Department has rejected that offer out of hand. Why?

3

This begs the question, "If the Regional Manager had been re-interviewed and said, "*Oh yes! Now that you mention it, I do remember those conversations with the Respondent. I did say that it was OK to try that supervision plan.*" Would then a veteran employee with an exceptional record who in fact been acclaimed as the Correctional Supervisor of the Year at the same time frame in which the events that led to his downfall were unfolding be looking at a 12 year setback in his career and the aspect of returning to field duty in the twilight of his career? Just one more short interview and a few more questions ....?

In continuing with a reasoned analysis of the evidence against the Respondent: The Fact Finding Officer has concluded that the Respondent filed certain inaccurate reports concerning supervision activities within the Respondent's former supervision unit. In reaching that conclusion, the Fact Finding Officer relies on Supervision Records that were created by the same officer who the Department sought to dismiss for creating false supervision records. In fact, the Department seeks to scourge the Respondent with supervision records upon which it relied to prosecute that officer for submitting false supervision records?

In addition to the supervision records, there were other documents in the offender's file that Respondent believed would contain exculpatory evidence or help to establish the veracity of his statements.

On September 13, 2002, Respondent filed a formal request to the Fact Finding Officer, asking for a copy of all of the documents in the offender's file to include a complete copy of the questioned supervision records. The Fact Finding Officer told Respondent that his request had been forwarded to the, "lawyers." On two additional occasions, Respondent asked the Fact Finding Officer about the status of his request for copies of the documents. This includes a verbal request made immediately prior to the start of the Fact Finding Meeting on October 1, 2002. Once again, the Fact Finding Officer said that he was still waiting for a reply from the, "lawyers." Respondent made a verbal objection about proceeding to the Fact Finding Meeting without the requested documents, but it was met only with a shrug of the shoulders.

Who were the, "lawyers," that the Fact Finding Officer continuously referred to? No lawyer claiming to represent the Department of Correction or the State of Delaware has ever contacted the Respondent or his attorney of record. This is very curious, especially in light of the fact that a formal motion was served on the Deputy Attorney General who was identified as being assigned to represent the Department. The procedure of proceeding to trial, hearing or even something as Star Chamber as a Fact Finding Meeting without having first resolved all of the outstanding motions and questions is so out of the ordinary in the usual practice of law and the administration of justice as to be questioned by any reasonable person. Who are these mythical lawyers? Let them come forward out of the shadows to explain why they denied an accused access to potentially exculpatory evidence prior to any form of hearing. Let them explain why the Respondent couldn't even see a copy of the entire record that was used destroy his career. Why were those records concealed?

4

Under existing departmental regulations, Respondent was entitled to a copy of all of the evidence that would be used to establish his guilt at least twenty-four hours prior to the Fact Finding Hearing. In his finding, the Fact Finding Officer cites materials from the offender's file, the supervision record for the entire period of supervision, case transfer records and material extracted from the Internal Affairs investigative report as grounds for his decision on the facts. Why was the Respondent denied access to that same material? Furthermore, there is every reason to believe that the Fact Finding Officer reviewed the offender's entire file and read the Internal Affairs report filed in Respondent's case as well as the Internal Affairs Reports filed in the cases of the other two officers that were disciplined. Were there other interview tapes and reports that the Fact Finding Officer was exposed to of which the Respondent is not even aware? There most probably was. For instance, how many times was the officer who accuses the Respondent interviewed? Did he make prior inconsistent statements? Was no one in this entire case not required to submit an Incident Report, as is the usual practice in the Department? The Respondent has not received any such material.

Why was the Respondent denied access to documents that the Fact Finding Officer was exposed to prior to the Fact Finding Meeting? In what part of the United States of America is a person severely punished by a government entity when evidence is hidden from the defendant and faceless, nameless lawyers play secret shell games with potentially exculpatory documents?

There is, in this case, a critical element regarding a specific date. That would be the date when the offender in question was officially transferred from one officer to another. This would also, according to the Department's theory, be the date on which a subordinate officer is alleged to have declared a conflict of interest to the Respondent. That date was so important that the Administrative Investigator went through great pains to create a precise time-line of events and to try to fix that specific event within the time-line.

As is revealed by the tape of the Respondent's interrogation of August 7, 2002, the Administrative Investigator stressed the importance of that date and tried very hard to refresh the Respondent's memory concerning that date, even within months. The Respondent explained that on the date in question, he had personally executed a Change of Status Notice and filed it. The Department's Master Files Database shows a record of that Change of Status action although the specific date has been obscured by subsequent transactions. The Change of Status Notice was executed in the presence of the two subordinate officers involved in this case.

The Administrative Investigator was advised that he had only to look in the offender's file to find the Change of Status Notice and the specific date would be revealed. The Administrative Investigator said that he would locate the Change of Status Notice and include it in his report. There is no mention of such an activity in his report. As things now stand:

1. According to the administrative investigator's report, two subordinate officers believe that the event took place at about three months into the supervision period. That would have been in the late summer or fall of 1999. It should be noted that one of those witnesses agreed with this time frame only when having it suggested to him by the investigators.

2. According to the administrative investigation report, the offender indicated that the event took place at about eight months into supervision. That would have placed the event in the winter of 2000.

3. The Fact Finding Officer states, in his formal finding, that the situation continued throughout the entire supervision period although there is absolutely no evidence what so ever to support that finding.

4. The Respondent believes and has testified that the event occurred sometime in the summer or fall of 2000.

If all of that controversy exists concerning the pivotal event upon which the Respondent's guilt is fastened, why has the critical document not been produced? Why was the Respondent denied access to those records?

There is included in the Fact Finding report a finding on several charges involving reports that were submitted by the Respondent to his immediate superior, the Regional Manager. The Fact Find Officer indicates that those reports are inaccurate.

The Administrative Investigator and the Fact Find Officer have both misrepresented the nature of the reports they refer to. Those reports were filed in conjunction with the supervisor's monthly population report more commonly known as monthly statistics. Those reports spoke to caseload size and gross offender control within the entire unit that consisted of 12 to 15 officers and a usual population of 900 plus offenders. The reports, do not address in any respect, the status of one case within that very large unit population.

The case in question was only addressed in writing on one occasion in a written report. That report was filed on August 2, 1999. It was an audit report of that specific case that occurred on June 16, 1999. It indicates that there was a technical problem with the case.

6

To anyone familiar with probation and parole supervision, that report also reveals that there was a case conference with the assigned officer at that time. The supervision records that were presented to the Respondent also indicate that a urine sample was taken from the offender on that same date and after that conference. This transaction bears every resemblance to a situation in which a supervisor notes a minor discrepancy in an officer's work and directs a correction without making a formal record of it. This happens every hour of every day in probation and parole supervision. You would be hard pressed to find a supervisor that makes a formal record of every shortcoming on the part of subordinate officers.

The reports cited by the Fact Finding Officer as being inaccurate were true and correct depictions of unit population control, as the Respondent understood it to be. There is absolutely no evidence to the contrary in the record. To single out those reports and charge the Respondent with filing false and inaccurate reports is an act of investigative legerdemain. It has all appearances of "manufactured" circumstantial evidence.

In summary, as to Just Cause, the evidence against the Respondent in this disciplinary action consists of the uncontested testimony of a subordinate officer who was attempting to mitigate his actions by deferring responsibility onto his supervisor. That subordinate officer has established a clear record of deception in this case up to and including filing completely false official reports. And, in the reliance on supervision records created by that same officer which were neither secured or copied in total by investigators at the outset of the investigation to insure their preservation as reliable evidence. Those records are valueless as evidence and should never have been relied upon in a disciplinary action case with a penalty of this magnitude. Furthermore the circumstantial evidence used to support a finding that the Respondent submitted inaccurate reports has been stretched so far that when examined in the clear light of day and measured against a standard of Just Cause, it must simply evaporate like the smoke that it truly is.

## II. The Administrative Investigation and Fact Finding process upon which this disciplinary action is based were incomplete, flawed and biased.

The Respondent submits that according to the records in his possession sometime in October 2001, an administrative investigation was initiated, by officials of the Bureau of Community Corrections, concerning an out-of-policy relationship between a probation/parole officer and an offender on that officer's caseload. The investigation was apparently initiated at the District/Unit level until it was transferred to the Internal Affairs Unit sometime after December 5, 2001. When the investigation began, the Respondent had been transferred out of the supervision unit in question for approximately one month.

Nowhere in the investigation reports, nor in the Fact Finding report is it mentioned that during the period between February 26, 2001 and early September, 2001 when Respondent was transferred to Bureau Headquarters the Respondent missed a total of 84 working days from work due to three separate illnesses that included cancer, a serious blockage of the urinary tract and a heart attack. All of those events required surgery and hospitalization. Yet, from every appearance, not only is there a thinly veiled attempt on the part of the Administrative Investigator and the Fact Finding Officer to conceal this information from the record, but they seek to hold the Respondent accountable for the actions of subordinate personnel during that same period of time. This omission reflects bias on the part of the Administrative Investigator and the Fact Finding Officer.

Also omitted from the investigator's report is the fact, clear from a reasoned analysis of the record, that the subject offender's file together with the supervision records upon which this disciplinary action is greatly dependant remained in circulation and was unsecured from the time that the investigation began until after January 9, 2002. The records were subject to tampering during that entire period.

It is the Respondent's contention that the records admitted against him as evidence were tampered with during the period in which they were unsecured.

Since Respondent's initial contact with the Internal Affairs officers on June 10th, 2002, he has asserted the claim that the evidence has been altered and otherwise tampered with. As a matter of sound investigative procedures and fundamental fairness in an unbiased investigation, someone should have investigated Respondent's assertion and included a report of that investigation in the documents that were forwarded to the Fact Finding Officer.

On August 7, 2002, Respondent alerted the Administrative Investigator as to the existence and probable location of a critical document that would have supported his recollection of events concerning the critical time-line. Respondent believes that those documents would have revealed exculpatory evidence.

8

The Administrative Investigator assured Respondent that he would continue his investigation in an effort to locate and secure that document and to include it among his exhibits. The Administrative Investigator failed to complete this critical investigative step. This discussion is included in the tape recording of the interrogation of August 7, 2002.

During Respondent's interrogation by the Administrative Investigator, an interrogation during which the investigator persisted in interrupting the Respondent before complete answers could be given, Respondent told the investigator about his immediate superior, the Regional Manager, having interviewed the offender in question personally. Respondent also told the investigator that the subordinate officer who initiated these events was aware of that meeting because he had set it up with the Regional Manager. At that time the subordinate officer was still employed by the Department and subject to compulsory cooperation in an administrative investigation. The offender himself had previously cooperated with the Internal Affairs officers and was still in departmental custody. An additional interview with those persons may have refuted the Regional Manager's contention that he had never heard of this offender until the investigation began.

It is possible that the Regional Manager was simply faulty of memory when the Internal Affairs officers questioned him. A follow-up interview of him by the Administrative Investigator in light of the new information that Respondent provided may have jogged the Regional Manager's memory concerning Respondent having briefed him. In that case, the investigator's opinion and the Fact Finding Officers conclusions may have been entirely different and this disciplinary action may not have been instituted.

The simple fact is that the Administrative Investigator was not interested in pursuing any avenues of investigation that might have led to exculpatory evidence. He had already reached the conclusion that Respondent was guilty. The final step of his investigation was his interview of the Respondent on August 7, 2002. His report was signed off on August 8, 2002 and on the desk of the Deputy Principal Assistant to the Bureau Chief by the early morning of August 9, 2002. Respondent knows this to be the fact because Respondent saw the report on that desk at that time. Furthermore, Respondent communicated with the Administrative Investigator on August 9, 2002, via receipted electronic mail, and received a reply that the investigative report was already in the hands of the Deputy Principal Assistant. That same Deputy Principal Assistant was eventually appointed to be the Fact Finding Officer in Respondent's case.

It is also clear from the documents presented to Respondent by the Department that the Administrative Investigator assigned to this case by the Bureau Chief didn't investigate anything. The only person that he personally interviewed was the Respondent. He merely took the report prepared by the internal affairs investigators along with copies of their taped statements and documents and based his entire investigative effort on a review of the Internal Affairs materials.

August 7, 2002 was a Wednesday. The Respondent's interrogation by the Administrative Investigator began at 8:37 AM. It took a considerable amount of time. The Administrative Investigator completed his report on August 8, 2002 and it was in the Administration Building by early morning on August 9, 2002. The Respondent believes that an inspection of departmental records will show that the Administrative Investigator began a period of leave at approximately the same time.

The disciplinary action in this case is very severe. It will affect the Respondent financially and emotionally for the rest of his life. It will affix a scaring cap to an otherwise outstanding public service career. Is it Just Cause for such a penalty to be imposed because an investigator is rushing to complete his work before going on leave? It Just Cause for an investigator to fail to pursue important avenues of investigation? What other potentially exculpatory evidence was overlooked or missed so that the Administrative Investigator could enjoy his leave?

As described above, this Administrative Investigation began in approximately October of 2001. Much of that investigation must have revolved around facts and circumstances that have led to the disciplinary action that is proposed here. And, there must have been reports. The Administrative Investigator in this case, indicates that he began his investigation on July 10, 2002. In the preamble of that report, he relates that documents were forwarded to him. Yet, only that single Administrative Investigation Report has been provided to the Respondent to assist in formulating his defense. Respondent has received neither Incident Reports from Unit or District investigators nor any report from the internal affairs investigators upon which all of the Administrative Investigator's, as well as the Fact Finding Officer's conclusions and are based.

An argument might be made that under departmental regulations Respondent is not entitled to copies of the missing reports unless the Fact Finding Officer considered them in this disciplinary action. There might be some merit in that argument except for the identity of the Fact Finding Officer who was appointed to sift through the mounds of information, judge the Respondents guilt or innocence and recommend Respondent's fate. The Fact Finding Officer appointed in Respondent's case was the Deputy Principal Assistant to the Bureau Chief. As such, he was privy to all of the reports that were generated since the inception of the original unit based investigation. Furthermore, he received detailed briefings from the Internal Affairs officers as they pursued their investigations of all aspects of this matter.

Therefore, by departmental regulation concerning disciplinary action, all of those documents should have been delivered to the Respondent no later that twenty-four hours prior to the Fact Finding Meeting. Or, this Fact Finding Officer should have recused himself.

10

The Fact Finding Meeting as set forth in the Departmental Disciplinary Action Policy is the first opportunity for an employee who is accused on an infraction of the rules and regulations to view the evidence of their guilt and to offer any defense against those accusations. After the Fact Finding Meeting, bad things begin to happen to the employee as they have in Respondent's case. Therefore, the Fact Finding Meeting is clearly the first step in the, "Due Process Rights," mentioned in Section 15.1 of the State Merit Rules.

In Delaware, as in the rest of America, administrative disciplinary action against an employee is an open and straightforward process. It generally follows the rules of civil procedure in the particular jurisdiction where the event is taking place. Those rules provide for a defendant in the civil disciplinary action to have reasonable access to facts and evidence that the employer is in possession of that might tend to prove or to disprove the allegations. There are no provisions for a, "hide the evidence shell game," as was present in the Respondent's case from the initial notification of charges throughout the Fact Finding Meeting itself.

The regulations now in force within the Delaware Department of Correction require that all evidence that will be considered by the Fact Finding Officer be provided to the accused employee no later than twenty-four hours prior to the Meeting. There is no requirement that the accused employee request anything. The materials must be provided. It is clearly the duty of the Fact Finding Officer to insure that they are provided.

In this case, on September 13'2002, Respondent provided the Fact Finding Officer with a written request asking for copies of the following documents:

1. A copy of the entire original probation file of ...[Offender name omitted for privacy]

2. Any written report created by Internal Affairs officers [names omitted for privacy] concerning their investigation into Respondent's actions.

Additionally, on September 13, 2002, Respondent sent a receipted electronic communication to the Fact Finding Officer asking to be provided with transcripts of the original tape-recorded statements of the witnesses in this case. Included in that request was a statement that Respondent understood that the transcripts would be produced at his expense.

It should be noted that the requests for transcripts was made according to the provisions of 11 Del. Code 9200 (c) (7). That aspect will discussed in detail in the following section of this submission. For the present it is sufficient to describe the request as a reasonable request for materials in the department's possession.

Since September 13, 2002, the Respondent made two additional verbal requests for the sought materials to the Fact Finding Officer. On both occasions, the Fact Finding Officer indicated that the requests were in the hands of the lawyers and that he couldn't do anything about it until he received an answer from them.

11

The requested transcripts were especially important to the respondent's defense in this case because the tape recording copies that were provided are generational copies of poor quality and both the Respondent and his attorney are hearing impaired. The respondent has only been able to listen to one of the tapes and can hardly understand that one. The Respondent remains totally ignorant to this moment of the statements that were used to find him responsible for acts that subjected him to severe punishment The statements are not even paraphrased in the Investigative Report as required by departmental regulation.

By denying the Respondent access to potentially exculpatory materials in its possession, the Department has violated its' own rules and by doing so has denied the Respondent even minimal due process of law.

By denying the Respondent transcripts of the original tape-recorded statements, even at his own expense, the Department has abandoned all pretext to fundamental fairness in its' disciplinary process.

Instead of due process of law, the Respondent was confronted with mythical lawyers, hide the evidence shell games and a fact fining officer who was so deeply involved in the entire investigation that his thought process may have actually colored the Administrative Investigator's thinking and conclusions.

The Respondent respectfully submits that this is not what the State Merit Rules mean when they speak of Due Process of Law. Furthermore, this is not what the United States Constitution means when it declares that no State may punish a citizen without Due Process of Law.

### III. The Administrative Investigation and the Fact Finding Process upon which this disciplinary action is based was and is unlawful:

The controlling rule of law concerning the disciplinary investigation and punishment of law enforcement officers in Delaware is the Law Enforcement Officer's Bill of Rights found at Title 11, Chapter 92 of the Delaware Code.

Section 9200 (b) of that Act defines the specific law enforcement officers who are protected by the Act. Probation and Parole Officers of the Department of Correction are included in the protected group.

The Respondent is classified as a Probation and Parole Operations Administrator, which is a mid-level management position within the Probation and Parole series. Probation and Parole Operations Administrators continue to be sworn law enforcement officers. They are issued badges and firearms and are expected to perform the law enforcement tasks associated with the probation and parole function if so required.

During his tenure as a Probation and parole Operations Administrator, the Respondent has been assigned to perform specific law enforcement work such as the pursuit and apprehension of persons who had escaped from correctional facilities.

The act further defines at Section 9200 (b) who is specifically excluded from its' protection. It reads, "…or to any other officer who is the highest ranking officer in the law enforcement AGENCY. Furthermore, no law enforcement officer not a member of 1 of the above AGENCIES shall be covered by this chapter.

Now, the Chief of the Bureau of Community Corrections may be the highest-ranking probation and parole officer in Delaware or the Director of Probation and Parole may be the highest-ranking Probation and parole officer in Delaware, but the Respondent is certainly NOT the highest-ranking probation and parole officer in Delaware. If the Department harbors any legal theory to the contrary, they should have announced that theory prior to the Fact Finding Hearing so that the Respondent had reasonable knowledge of the Department's position.

The Department has not announced any such theory because no such theory is prudent in light of the black letter language found in Chapter 92.

However, throughout the investigative and disciplinary process in this case, investigators and departmental management have consistently constantly and deliberately ignored the Respondent's rights under the Law Enforcement Officer's Bill of Rights.

13

On June 10, 2002, Internal Affairs officers went so far as to present Respondent with a written documents entitled, "Pre-Interview Advisement Form as required under Title 11 Section 9200 –b," while those very same officers were at that very moment engaged in a violation of those rights with regard to the locations at which an accused officer may be questioned.

On September 13, 2002, Respondent personally presented the Fact Finding Officer with a formal Motion to suppress unlawfully obtained evidence in this case pursuant to 11 Del. C. 9206. That Motion describes the many specific instances in which the Respondent's rights pursuant to 11 Del. C. 9200 were violated during the Administrative Investigation. The Motion was also served on the Deputy Attorney General assigned to represent the Department of Correction.

That Motion as well as all other requests filed by the Respondent pursuant to the Law Enforcement officer's Bill of Rights have been ignored by the Department from September 13, 2002 through the present time.

A copy of the Motion to Suppress Unlawfully Obtained Evidence is annexed hereto for reference.

At this time, the following violations of 11 Del. C. 9200 are asserted by the Respondent here:

1. That on June 7, 2002, Respondent was advised by his immediate superior officer that he was the subject of an "investigation." Respondent was ordered to contact the Internal Affairs Unit of The Department of Correction, which had been directed to conduct the "investigation."
2. That on June 7, 2002, Respondent telephoned the Director of The Internal Affairs Unit who directed Respondent to report to the Internal Affairs Unit on Monday, June 10, 2002 at 1:00 PM.
3. That on June 10, 2002, Respondent reported to the Internal Affairs Unit as directed. Two investigators told him that they were conducting an Administrative Investigation. They presented Respondent with a form entitled: <u>Department of Correction, Internal Affairs Unit, Bill Of Rights Pre-interview Advisement Form.</u>
4. That this form states at Paragraph 2 that, "Internal Affairs is conducting an investigation into the following allegations: Violation of Section 16 of Delaware Corrections Code of Conduct: Contact with offender [NAME OMITTED FOR PRIVACY] The Form does not state that any additional violations of The Rules or Regulations of The Department of Correction were being investigated beyond a violation of Section 16 of the DOC Code of Conduct.

14

5. Respondent was then subjected to an interrogation during which the Internal Affairs officers seized certain copies of invoices and cancelled checks, which were the personal property of Respondent. That action was contrary to and in violation of 11 Del. C. 9202 which states that no officer shall be required OR REQUESTED to disclose any item of personal property, income, assets, sources of income, debts, personal or domestic expenditures (including those of any member of the officer's household) unless such information is necessary in investigating a violation of any federal, state or local ordinance with respect to the performance of official duties unless such disclosure is required by state or federal law.

6. The interrogation described took place at the offices of the DOC Internal Affairs Unit, which is located in an isolated green building in a rural area near Smyrna, Delaware. At no time during the interrogation did the Internal Affairs investigators solicit or obtain a waiver, written or otherwise, from Respondent consenting to be interviewed at this location. Furthermore, at no time did the Internal Affairs officers advise Respondent that they were investigating any violations of the DOC Rules and Regulations beyond a violation of Section 16 of the DOC Code of Conduct.

7. Title 11, Chapter 92, Section 9200(c)(2) provides as follows: The questioning shall take place at the agency headquarters or at the office of the local troop or police unit in which the incident allegedly occurred as designated by the investigating officer or unless otherwise waived in writing by the officer being investigated.

8. Title 11, Chapter 92, Section 9200(c)(4) provides as follows: The law-enforcement officer under investigation shall be informed in writing of the nature of the investigation prior to being questioned.

9. The isolated green building near rural Smyrna, Delaware is not the headquarters of the Department of Correction, nor did the Internal Affairs investigators advise Respondent that any part of the incidents under investigation occurred at that building, nor did they solicit any waver of the location of the interrogation. Furthermore, at no time during the course of the interrogation did the investigators advise Respondent that any additional violations of the DOC Rules and Regulations were being investigated.

10. That subsequent to the interrogation conducted by Internal Affairs investigators, Respondent received a letter from another management official, dated July 10, 2002. That official has been identified as the Administrative Investigator throughout this document. He advised that the information compiled by Internal Affairs including documents presented during the Internal Affairs interview had been turned over to him and that he was now conducting an investigation into the matters raised in this process.

15

11. That on July 29, 2002, Respondent received electronic State mail from the Administrative Investigator directing the Respondent to report for an additional interview. The message states in part, "The location of the interview is the Day Reporting Center, Classroom #2 at Dover P&P." Once again, the interview location chosen by investigators in this case was neither the agency headquarters nor the location where the incident occurred. Once again, no waiver was solicited from nor executed by the Respondent.
12. That since September 2001, Respondent has been stationed at the headquarters of the Department of Correction, occupies an office at that location and could have easily been interviewed according to the provisions of Title 11, Chapter 92, Section 9200(c)(2).
13. That at the commencement of the interview conducted at the Dover Probation and Parole office by the Administrative Investigator, Respondent was presented with a form entitled Delaware Department of Corrections, Pre-interview rights form Paragraph A. of that form states, "You are being questioned as part of an official administrative investigation of this agency into potential violations of department rules and regulations. The issues being investigated concern alleged violations of: Delaware Department of Corrections (DDOC) policy 8.9, Conflict of Interest, DDOC Bureau of Community Custody and Supervision Policy 8.9, Conflict of Interest, DDOC Code of Conduct, Section 9, Conflict of Interest, DDOC Code of Conduct, Section 15, Reporting, DDOC Code of Conduct, Section 16, Contact with Offenders, DDOC Code of Conduct, Section 23, Conduct Unbecoming, DDOC Section 27, Department investigations, DDOC Bureau of Community Custody and Supervision (BCCS) Policy 4.3 Case Audit System, DDOC BCCS 6.3 level III Intensive Supervision, DDOC BCCS Policy 7.2, Supervision Plan and Record, DDOC BCCS Policy 7.3 Supervision Activities.
14. The same form, at Paragraph I states, "Anything you say may be used against you not only in any subsequent departmental charges, but also in any subsequent criminal proceedings." At no time did the Administrative Investigator advise Respondent of his rights against self-incrimination.
15. An interrogation was then initiated concerning the allegations enumerated in that document. The Administrative Investigator stated that this was a continuation of the same investigation that had been initiated by Internal Affairs and that he was using material provided to him by Internal Affairs to pursue the investigation. He questioned Respondent extensively about the statement that Respondent made to Internal Affairs on June 10, 2002.

16

16. That the interrogation conducted by The Administrative Investigator on August 7, 2002 was unlawful in its entirety on the following grounds:

a) The interrogation was conducted under compulsion and without waver at a location other that the agency headquarters or the location where the alleged incident occurred.

b) The written Pre-Interview Rights Form states that the information gained in the interview could be used in any subsequent criminal proceedings. Title 11, Chapter 92 at Section 9200(c)(8) states," If the law-enforcement officer under interrogation is under arrest or may reasonably be placed under arrest as a result of the investigation, the officer shall be informed of the officer's rights, including the reasonable possibility of the officer's arrest prior to the commencement of the interrogation. No such warning was given. Had such a warning been given the Respondent would most certainly have sought legal counsel before submitting to an interrogation.

c) This investigator was the third investigator to question Respondent during the course of what he described as, "the same investigation." Title 11, Chapter 92, Section 9200 (c)(3) states in pertinent part "…All questions directed to the officer shall be asked by and through no more than 2 investigators.

d) On June 10, 2002 when Respondent was questioned by the first two investigators, he was advised that only a violation of Section 16 of the DDOC Code of Conduct was being investigated. No warnings were given concerning the investigation of other violations. The Administrative Investigator used the respondent's statement of June 10, 2002 and evidence derived from that same statement to expand the investigation into additional multiple charges.

e) At the conclusion of the Administrative Investigation and up until the present time no investigator has advised the Respondent of the conclusions of the investigation or their recommendations as required at 11 Del. C. 9200 (c) (11).

All of the Departments evidence, beginning with Respondent's interview on June 10, 2002 and beyond has been unlawfully obtained and must be suppressed according to the provisions of 11 Del. C. 9206.

11 Del. C. 9203 states that a law enforcement officer who is covered under the provisions of 11 Del. C. Chapter 92 must be afforded a hearing as described at 11 Del. C. 9204 and 9205.

The Fact Finding Meeting that took place on October 1, 2002 was nothing more than an extension of the investigation and in no way resembles the Due Process Hearing required by the 11 Del. C. 9204 and 9205.

17

On the contrary, the Department has gone to great length to obstruct Due Process by denying Respondent access to critical exculpatory evidence, ignoring proper Motions and requests for discovery filed under the provisions of Chapter 92, failing to conduct a complete and unbiased investigation and failing to conduct a proper hearing which included the right to cross examine witnesses.

If it is the Department's official legal position that the provisions of the Law Enforcement Officer's Bill of Rights do not protect the Respondent, it has a legal and moral obligation to come forward with that position. It must set forth the good and sufficient legal arguments to support its position and is was obligated to do that before the Fact Finding Meeting commenced so that the Respondent knew under which rules, procedures and laws he was proceeding.

Instead, the Department allowed the Respondent to proceed into the Fact Finding Meeting with the expectation that the only penalty that could be imposed as the result of anything less that a disciplinary hearing as provided for at 11 Del. C. 9204 and 9205 was the reprimand mentioned at 11 Del. C. 9203. The Fact Finding Officer fostered that belief by stating at the outset of the Fact Finding Meeting, "You don't need a lawyer for this."

The Fact Finding Officer allowed the Respondent to abuse himself of the belief that the disciplinary action would be limited to a reprimand when in fact he intended to recommend the maximum penalty that an employer can impose on an employee – that of dismissal!

In this case, someone in Departmental management formed a conspiracy theory then proceeded to stretch, bend and contort the evidence to fit the theory. By denying Respondent lawful due process as required by Chapter 92, the Department seeks to inflict a severe penalty on a citizen (even if that citizen is merely a state employee) by the shear overwhelming power of the State.

This application of overwhelming brute force in the guise of state law is precisely the grist that the equal protection and due process clauses of the 14th Amendment to the United States Constitution and its various statutory and case law progeny were designed to grind.

The heavy handed infliction of severe discipline in deliberate indifference to the black letter provisions of the Law Enforcement Officer's Bill of Rights is a clear and egregious violation of Respondent's equal protection and due process rights as guaranteed by the United States Constitution.

Additionally, the individual persons who continue to insist on inflicting punishment on the Respondent under color of State law are committing criminal acts.

Title 18, Section 242 of the United States Code makes it a crime for any person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution and Laws of the United States. That Act provides for penalties of fines and imprisonment of not more that one-year or both. Equal protection and due process of law pursuant to 11 Del. C. 9200 and pursuant to the State Merit Rules are the rights that 18 USC 242 is intended to protect.

The actions of the Department of Correction is bringing this disciplinary action was and is unlawful and must be terminated immediately.

Very respectfully submitted:


_John G. Doherty, Jr._

John G. Doherty, Jr.

Respondent